Michael A. Bliven
Oregon State Bar No. 942510
BLIVEN LAW FIRM, PC
704 S. Main
Kalispell, MT 59901
Telephone: (406) 755-6828
mike@blivenlawfirm.com

Robert F. Dwyer, III
Oregon State Bar No. 984197
BLIVEN LAW FIRM, PC
202 North Main Street, Suite 1
Boardman, OR 97818
Telephone: (406) 755-6828
rdwyer@blivenlawfirm.com

John Heenan (*pro hac vice forthcoming*)
HEENAN & COOK
1631 Zimmerman Trail
Billings, MT 59102
Telephone: (406) 839-9091
john@lawmontana.com

Steve W. Berman (*pro hac vice forthcoming*)
Meredith S. Simons (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98134
Telephone: (206) 623-7292
steve@hbsslaw.com
merediths@hbsslaw.com

Abigail D. Pershing (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
abigailp@hbsslaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISON

| | |
|---|---|
| MICHAEL PEARSON, ROSA CAVASOS, JEFFREY FLEMING, and JON HALEY, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PORTLAND GENERAL ELECTRIC COMPANY and COLUMBIA RIVER PROCESSING, LLC,<br><br>Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   PARTIES ............................................................................................. 5

      A.    Plaintiffs ...................................................................................... 5

            1.    Michael Pearson ................................................................. 5

            2.    Rosa Cavasos .................................................................... 6

            3.    Jeffrey Fleming ................................................................. 7

            4.    Jon Haley ........................................................................... 8

      B.    Defendants ................................................................................... 9

III.  JURISDICTION AND VENUE .......................................................... 9

II.   STATEMENT OF FACTS ................................................................ 10

      A.    Exposure to high levels of nitrates is dangerous to human health. ..................... 10

      B.    High levels of nitrates damage the environment................................. 12

      C.    The EPA and the Oregon DEQ have established nitrate-related
            guidelines. ................................................................................. 13

      D.    Defendants have caused nitrate contamination in the groundwater
            that Plaintiffs and Class members rely on for their drinking water. .................. 14

            1.    Defendants generate high-nitrate wastewater. ........................ 14

                  a.    PGE ................................................................................. 14

                  b.    Columbia River Processing............................................. 15

            2.    Defendants partner with the Port of Morrow for disposal of their high-
                  nitrate wastewater, even though they know the Port improperly disposes of
                  this wastewater........................................................................ 16

            3.    Nitrates in discarded wastewater move downgradient from the farms
                  where they are land-applied to Plaintiffs' wells. ..................... 20

            4.    The wells Plaintiffs rely on for drinking water are contaminated with
                  nitrates generated by PGE and Tillamook. ............................. 22

E.    Nitrate pollution from PGE and Tillamook has harmed Plaintiffs and the Class. ........................................................................ 26

    1.    Plaintiffs and Class members who rely on private wells have been harmed. ......................................................................... 26

    2.    Plaintiffs and Class members who rely on water drawn from public wells have been harmed. ................................................ 27

B.    Mitigating the harm Defendants have caused will require significant resources. .................................................................. 28

    1.    Mitigating harm to well-reliant Plaintiffs and Class members. ............... 28

        a.    Ensuring access to clean tap water. ............................................. 28

        b.    Medical monitoring. ..................................................................... 28

    2.    Mitigating harm to Plaintiffs and Class members who rely on public water. ......................................................................... 29

IV.    CLASS ALLEGATIONS ......................................................................... 29

A.    All requirements of Fed. R. Civ. P. 23(a) are met. ............................... 30

B.    All requirements of Fed. R. Civ. P. 23(b)(3) are met. .......................... 30

COUNT I RESOURCE CONSERVATION AND RECOVERY ACT, 42 U.S.C. § 6972(a)(1)(B) ................................................................................... 32

COUNT II NEGLIGENCE ................................................................................... 34

COUNT III TRESPASS ........................................................................................ 35

COUNT V PRIVATE NUISANCE ....................................................................... 36

PRAYER FOR RELIEF ........................................................................................ 37

JURY DEMAND ................................................................................................... 38

Plaintiffs Michael Pearson, Rosa Cavasos, Jeffrey Fleming, and Jon Haley (hereinafter "Plaintiffs"), on behalf of themselves and all others similarly situated, allege as follows:

## I.    INTRODUCTION

1.    Easy and cheap access to clean drinking water is part of the fabric of life in the United States. People living in the United States expect to get clean water when they turn on the kitchen tap. And the State of Oregon has declared that pollution of any of the waters of the State is not a reasonable use of such waters and is contrary to public policy. ORS 468B.020(1). But for tens of thousands of people who live in Oregon's Morrow and Umatilla counties, including Plaintiffs and other Class members, accessing potable water is not so simple because their water is dangerously polluted.

2.    For those in the class area who draw their water from private wells, the tap water in their homes is so polluted with nitrates that it is unsafe to drink. At high concentrations, nitrates cause cell damage and lead to birth defects and cancer. Infants are particularly susceptible to methemoglobinemia (or "Blue Baby Syndrome"), a condition caused by nitrate consumption that prevents blood from carrying oxygen and can be fatal. To protect their health, Plaintiffs and Class members whose homes are supplied by private wells must forego the ease of turning on the tap when they need water, and instead rely on bottled water for all drinking, cooking, and other household purposes.

3.    Others in the community, who have access to public water that is treated to remove nitrates, are largely spared the health concerns that threaten their well-reliant neighbors. But this access to safe water comes at a significant cost. Compared to people who live in areas with low nitrate contamination, people in Morrow and Umatilla counties face inflated water bills to cover public water departments' expenditures on removing excess nitrates from their water.

4.    Defendants Portland General Electric Company ("PGE") and Columbia River Processing, LLC, also known as Tillamook, ("Tillamook") are responsible for contributing to nitrate contamination in Morrow and Umatilla counties. Both Defendants' industrial processes generate hundreds of millions of gallons of high-nitrate wastewater every year. Rather than properly discarding this wastewater, they send it to the Port of Morrow, a port authority that runs an industrial wastewater treatment and disposal system—even though both Defendants know the Port routinely violates the permit that governs its wastewater disposal. These are not sporadic, one-off violations. Since 2015, the Port has violated its permit more than *two thousand times*. And the Port has publicly said it intends to continue violating that permit. Nevertheless, despite knowing that the high-nitrate wastewater they transfer to the Port will be improperly managed, both Defendants continue partnering with the Port to discard their wastewater.

5.    After receiving wastewater from PGE and Tillamook, the Port dumps the water, without first removing the nitrates, directly onto land in Morrow and Umatilla counties. This process is depicted in the image below.



*Image 1. The Port discarding wastewater onto an empty field in December 2023.*



6.     Once on the ground, nitrates percolate down to the groundwater of the Lower Umatilla Basin. The groundwater, along with the nitrates it carries, moves downgradient from areas of high water pressure to low water pressure. The private and public wells on which Plaintiffs and Class members rely are all downgradient of land where the Port dumps PGE and Tillamook wastewater. As such, the nitrates in that wastewater eventually make their way to Plaintiffs' and Class members' wells.

7.     Groundwater in the Lower Umatilla Basin, including the groundwater on which Plaintiffs and Class members rely, is so polluted with nitrates that the Oregon Department of Environmental Quality ("DEQ") has declared it a "Groundwater Management Area." The Lower Umatilla Basin Groundwater Management Area (the "LUBGWMA") encompasses approximately 562 square miles of land in northern Morrow and Umatilla counties. Many LUBGWMA residents, including many Class members, are Latino or indigenous. And many live below the federal poverty line.

*Image 2. Lower Umatilla Basin Groundwater Management Area*



8.    The Oregon DEQ applies a "Groundwater Management Area" designation to a region only when nitrate concentrations in groundwater samples approach or exceed the federal safe drinking water standard. The federal safety threshold, established by the Environmental Protection Agency ("EPA"), is set at 10 milligrams per liter ("mg/L"); Oregon's own threshold for establishing a Groundwater Management Area is 7 mg/L. Nitrate levels in the LUBGWMA blow past these safety limits: water samples taken from area wells have revealed nitrate concentrations of over 40 mg/L, more than four times the federal safety threshold and more than five times Oregon's Groundwater Management Area trigger threshold.

9.    Plaintiffs now seek to hold Defendants accountable for their role in causing this pollution. Allowing Defendants to continue contaminating the water in the LUBGWMA is an environmental and social injustice. Plaintiffs and other Class members should not be required to tolerate continued exposure to contaminated water or to bear the cost of obtaining non-polluted water.

10.    Plaintiffs bring a citizen suit against PGE and Tillamook under the Resource Conservation and Recovery Act seeking to prevent Defendants from polluting the LUBGWMA with nitrates and seeking injunctive relief that would enable residents of the affected areas to access clean water.

11.    In addition to their federal claim, Plaintiffs bring claims of negligence, trespass, and private nuisance under Oregon law.

12.    As a remedy under RCRA and their state law claims, Plaintiffs also seek a medical monitoring program for people in the area to help scientists and the medical community promote early detection and advances in the treatment of diseases caused by exposure to excess nitrates.

13.     Plaintiffs bring these claims on behalf of themselves and two proposed Classes: one Class of people who rely on private wells for their water, and another Class of people who rely on public water systems.

## II.    PARTIES

### A.    Plaintiffs

#### 1.    Michael Pearson

14.     Plaintiff Michael Pearson is a resident of Morrow County, Oregon.

15.     Mr. Pearson owns a home located at 70159 Summit Lane, Boardman, Oregon, 97818, which he purchased in 1997. His home draws its water from the Umatilla Basin through a private well. Mr. Pearson and his family depend on their home's well to provide water for drinking, cooking, bathing, and other domestic purposes.

16.     In June 2022, Mr. Pearson learned that the Morrow County Commission had declared a local state of emergency over groundwater nitrate pollution that compromised drinking water for many Morrow County residents.

17.     Concerned for his family's safety, Mr. Pearson decided to have his well tested for nitrates. Oregon Rural Action ("ORA") performed a test of Mr. Pearson's well; test results showed nitrate levels of 46.8 mg/L—over four times the safe limit of 10 mg/L established by EPA, and more than six times the Oregon GMA trigger threshold of 7 mg/L.

18.     In an effort to protect his family from further exposure to unsafe levels of nitrates, Mr. Pearson installed a reverse osmosis filtration system in his well. Local taxpayers paid for Mr. Pearson's filtration system, which was provided to him by Morrow County.

19.     However, the filtration system was unable to bring nitrate levels in his well down to safe levels. After installing the filtration system, Mr. Pearson again had water from his kitchen tested. The results from this testing revealed that the treated water had a nitrate concentration of

16.4 mg/L—still more than one-and-a-half times the EPA's safety threshold, and more than twice Oregon's GMA trigger threshold.

20.    To ensure his family has access to clean water, Mr. Pearson has now resorted to using bottled water. Every week, Mr. Pearson and his wife use between six and eight five-gallon water bottles for drinking and cooking. Relying on bottled water is inconvenient for Mr. Pearson and his family. For example, when brewing a pot of coffee, Mr. Pearson cannot simply turn on the tap to fill a pot. Instead, he must lift and carry a five-gallon bottle of water weighing 41 pounds from storage, bring the bottle to his kitchen, open the bottle, and pour it into the coffee pot. What's more, the delivery of water has not been on schedule and has been inadequate. Because the delivery driver does not keep a schedule, empty bottles that Mr. Pearson exchanges for full bottles blow off Mr. Pearson's porch and into his yard; occasionally, these empty bottles also blow into the road. Mr. Pearson has had to call the delivery company on several occasions because they have not brought water as scheduled, or have not brought enough water to satisfy his family's regular household use.

21.    Defendants' actions, which have contaminated Mr. Pearson's well with nitrates, have directly and proximately caused all the expenses and inconveniences that Mr. Pearson and his family have endured and continue to endure. This contamination has diminished the value of Mr. Pearson's property, caused him monetary damages, unreasonably interfered with his quiet enjoyment of the property, damaged his cells, and unreasonably exposed Mr. Pearson and his family to an increased risk of disease.

**2.    Rosa Cavasos**

22.    Plaintiff Rosa Maria "Rosie" Cavasos is a resident of the city of Boardman, Morrow County, Oregon.

23.     Ms. Cavasos owns a home located at 412 SW Goldfinch Lane, Boardman, OR 97818. She purchased this home in July of 2024. She lives at this home with her 34-year-old son, Conrad.

24.     Ms. Cavasos's home is supplied with water via the city of Boardman's  Water Department. Ms. Cavasos depends on Boardman public water to provide water for drinking, cooking, bathing, and other domestic purposes. Ms. Cavasos pays a monthly water bill for the water she receives from the city of Boardman.

25.     Ms. Cavasos did not learn that the public water she relies on sometimes exceeds safe nitrate levels until significantly after the water emergency was declared in Boardman, when she attended a number of community meetings.

26.     Out of concern that her water may be unsafe, Ms. Cavasos purchases bottled water from Walmart and Safeway to ensure she has access to clean, safe drinking water. Ms. Cavasos uses this water for cooking and making coffee, but she finds that using bottled water for these purposes is inconvenient and expensive. Her household uses two cases (either a 24-pack or a 36-pack) of 16oz bottles per week. She sometimes purchases even more bottles of water for a holiday like Thanksgiving. Ms. Cavasos spends at least $30 per month on bottled water.

27.     Defendants' actions, which have contaminated Ms. Cavasos's tap water with nitrates, have directly and proximately caused all the expenses and inconveniences that Ms. Cavasos and her family have endured and continue to endure. This contamination has caused Ms. Cavasos monetary damages and unreasonably interfered with the quiet enjoyment of her home.

**3.     Jeffrey Fleming**

28.     Plaintiff Jeffrey Fleming is a resident of Morrow County, Oregon.

29.     Plaintiff Fleming owns a home located in Irrigon, Oregon. He lives at the home with his wife and children.

*Pearson, et al. v. Portland General Electric Company, et al.*                                                          - 7 -
Class Action Complaint

30.     Plaintiff Fleming's home is not connected to any public water system and he and his family rely on their private well to provide water for drinking, cooking, bathing, and other domestic purposes.

31.     In 2024, Plaintiff Fleming's well tested at a nitrate concentration of 15 mg/L—5 mg/L above the EPA's safety threshold for safe drinking water.

32.     Plaintiff Fleming was surprised to learn that his water was contaminated with nitrates and subsequently began purchasing bottled water to drink rather than drinking the well water, before ultimately applying for and being approved to receive bottled water from Morrow County. Although he no longer has to pay for the bottled water, he does have to store it, which is less convenient than his formerly drinkable well water. Plaintiff Fleming further had a reverse osmosis system installed below his kitchen sink but doubts that this is sufficient to ensure safe water for him and his family.

33.     Nitrate contamination has interfered with Plaintiff Fleming's quiet enjoyment of his property, caused him to pay out of pocket costs for his reverse osmosis system, damaged his cells, and unreasonably exposed him and his family to an increased risk of disease.

**4.    Jon Haley**

34.     Plaintiff Jon Haley is a resident of Morrow County, Oregon.

35.     Plaintiff Haley rents a home located in Irrigon, Oregon. His home is supplied with water via Irrigon's city water system. Haley depends on Irrigon's city water to provide water for drinking, cooking, bathing, and other domestic purposes.

36.     Plaintiff Haley was surprised to learn that his water was sometimes contaminated with nitrates and has since purchased bottled water to drink rather than drinking the supplied city water.

37.     Using bottled water is inconvenient and expensive. Haley spends at least $50 per month on bottled water, and he must regularly purchase water, bring it home, and store it, rather than just turning on his tap and knowing he is accessing clean water.

38.     Defendants' actions, which have contaminated Haley's water with nitrates, has interfered with Haley's quiet enjoyment of his property and caused him monetary damages.

**B.    Defendants**

39.     Defendant Portland General Electric Company ("PGE") is a power company incorporated in Oregon with its principal place of business in Oregon. PGE operates a power generation facility at the Port of Morrow known as PGE Coyote Springs. PGE had annual revenues of $2.8 billion in 2024.

40.     Defendant Columbia River Processing, LLC is a dairy products manufacturer with its principal place of business in Oregon. Columbia River Processing is also known as "Tillamook" because it is a wholly owned subsidiary of Tillamook County Creamery Association, also a dairy products manufacturer with its principal place of business in Oregon. Columbia River Processing does not operate independently of Tillamook; it is the corporate entity through which Tillamook County Creamery Association operates a cheese production facility at the Port of Morrow.

### III.    JURISDICTION AND VENUE

41.     This Court has jurisdiction over this action under the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a), and 28 U.S.C. § 1331 ("RCRA"). This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a). Plaintiffs' state law claims derive from the same common nucleus of operative fact as their RCRA claims, *i.e.*, their federal and state claims all arise from the fact that Defendants' conduct has contaminated the groundwater upgradient of Plaintiffs' water sources.

42.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 6972(a) because the events giving rise to the claims in this Complaint occurred in Oregon.

43.    In addition, both Defendants in this case, as well as the EPA and Oregon DEQ, were provided with notice of intent to file this action more than 90 days prior to the filing of this Complaint, as required by 42 U.S.C. § 6972(b)(2)(A). Notice was delivered to PGE on March 18, 2024. Notice was delivered to Columbia River Processing on March 20, 2024. Copies of the notices sent to PGE and Columbia River Processing were mailed to the Administrator of the EPA, the Regional Administrator of the EPA, and the Oregon Department of Environmental Quality on March 7, 2024.

## II.    STATEMENT OF FACTS

### A.    Exposure to high levels of nitrates is dangerous to human health.

44.    Ingesting water with nitrate concentrations of more than 10 mg/L causes significant health problems.

45.    High doses of nitrates prevent red blood cells from carrying adequate levels of oxygen throughout the body, resulting in cyanosis and asphyxia. Low blood-oxygen levels are particularly dangerous for infants, leading to the development of Blue Baby Syndrome (infant methemoglobinemia), which can be fatal. Babies with this syndrome may turn a blue or grey color as their bodies become starved of oxygen. The condition can progress rapidly to cause coma or death if not treated promptly. Formula-fed infants are especially susceptible to Blue Baby Syndrome if the water used to make their formula is high in nitrates.

46.    Nitrate-heavy water is also harmful to older children and adults. Exposure to excess nitrates causes reproductive complications (including preterm birth and birth defects), kidney and spleen disorders, and respiratory diseases. Ingesting high levels of nitrate also causes various cancers, especially colon, kidney, stomach, thyroid, and ovarian cancer.

47.     The harm from excess nitrates is not limited to people who have developed acute illnesses. Everyone who ingests high-nitrate water is impacted at the cellular level, even if they do not show obvious outward signs of disease. This is because the body converts approximately 5 to 10% of ingested nitrates into nitrites, and these nitrites form carcinogenic compounds known as nitrosamines.

48.     At low levels of nitrate consumption, the body uses dietary antioxidants to prevent nitrates from reacting with secondary amines to form nitrosamines. But when people ingest high levels of nitrates—including by drinking water that has a concentration of greater than 10 mg/L— the high concentration of nitrates interferes with the body's ability to prevent nitrosamine formation. Nitrosamines destabilize DNA and increase its breakage rate, leading to base mispairings and ultimately to cancer development. Each time a nitrosamine encounters (or "hits") a cell, it causes active DNA damage to that cell. Accumulation of this damage leads to cancer cell formation, as demonstrated in the diagram below.

*Image 3. Example of cancer development after multiple hits from nitrosamine exposure.*



49.     Thus, everyone who has consumed water with nitrates in excess of 10 mg/L has been impacted at a cellular level.

**B.      High levels of nitrates damage the environment.**

50.     In addition to harming human health, excess nitrogen and nitrates in the environment lead to a cascade of ecological issues. When nitrogen reaches a body of water, it stimulates the growth of algae. At moderate levels, algae serve as food for aquatic organisms, but at high levels, excess algae growth blocks sunlight and leads to depletion of oxygen levels in water. This phenomenon, known as eutrophication, has negative consequences for biodiversity, fisheries, and recreational activity. When excess algae die and decompose, hypoxic conditions arise, creating zones where oxygen levels are too low to support marine life. In extreme cases, hypoxia results in large-scale marine death. Beyond these issues, exposure to nitrate directly harms aquatic animals by causing reduced growth, slower maturation, and decreased reproductive success.

51.     Terrestrial life also suffers from excess nitrate and nitrogen that permeates the environment. Excess nitrogen disrupts the nutrient balance in soils, creating conditions that are more favorable for nitrogen-loving plants compared to other species. Over time, this leads to a reduction in plant diversity and encourages the growth of species that thrive in nitrogen-rich environments—some of which may be invasive species—at the expense of native flora. And, although nitrogen can stimulate the growth of certain plants, this growth is often shallow and weak, rendering those plants more susceptible to disease, pests, and environmental stress. Alterations in plant communities subsequently affect herbivores and higher trophic levels that depend on these plants.

52.     The Columbia River is beginning to experience these negative effects as a result of excess nitrate. A study of the Hanford reach of the river, just upriver from the LUBGWMA, indicates that nitrates applied to land near the river play an important role in transferring nitrates into the water at concentrations high enough to "negatively interfere with the shoreline aquatic

habitat."[1] On information and belief, the nitrates that Defendants are contributing to the LUBGWMA, which eventually make their way to the Columbia river, are having similar negative impacts.

**C.    The EPA and the Oregon DEQ have established nitrate-related guidelines.**

53.    Given the known human health and environmental consequences of nitrate pollution, both the federal government and the State of Oregon have established nitrate-related guidelines.

54.    On the federal level, the EPA has declared water unsafe for human consumption when it contains nitrates at a concentration of 10 mg/L or greater. For nitrite (which can form in stagnant nitrate-containing and oxygen-poor water), the limits are even stricter: no more than 1 mg/L is safe for human consumption.[2]

55.    On the state level, the Environmental Quality Commission—a five-member panel appointed by the governor of Oregon to serve as the Oregon DEQ policy and rulemaking board—has also addressed the issue of nitrate contamination and established water quality standards. In 2014, the Environmental Quality Commission adopted revisions to Oregon's water quality standards designed to reduce or prevent toxic pollutants in Oregon waterways, set out in Table 40 of Oregon Administrative Rule 340-041-8033. Table 40, established "to protect Oregonians from potential adverse health impacts associated with long-term exposure to toxic substances,"[3] sets a

---

[1] Abigail Conner et al., *Groundwater Inflows to the Columbia River Along the Hanford Reach and Associated Nitrate Concentrations*, 3 Frontiers in Water 1 (Apr. 2021).

[2] World Health Organization, *Guidelines for Drinking Water Quality*, https://www.who.int/docs/default-source/wash-documents/wash-chemicals/nitrate-nitrite-chemical-fact-sheet.pdf?sfvrsn%3D8f174e95_4. (last visited Dec. 4, 2025).

[3] State of Oregon Department of Environmental Quality, *TABLE 30:  Aquatic Life Water Quality Criteria  for Toxic Pollutants*,

"human health criteria" limit of 10,000 μg/L for nitrate (equivalent to 10 mg/L). The EPA approved Table 40 in an August 4, 2015 letter to Wendy Wiles, the administrator for DEQ's Environmental Solutions Division.[4]

56.    In addition to this 10 mg/L standard, Oregon also requires that DEQ designate any area with groundwater nitrate concentrations of 7 mg/L or above (70% of the EPA Maximum Contaminant Level) as a "Groundwater Management Area." The state, through DEQ, directs additional resources to lowering nitrate concentrations in groundwater management areas.

**D.    Defendants have caused nitrate contamination in the groundwater that Plaintiffs and Class members rely on for their drinking water.**

**1.    Defendants generate high-nitrate wastewater.**

**a.    PGE**

57.    PGE operates a power plant known as Coyote Springs at the Port of Morrow. PGE Coyote Springs generates an estimated 900 million gallons of industrial wastewater each year from a combination of cooling tower wastewater, boiler blowdown water, and wash water.

58.    PGE's wastewater is extremely high in nitrates. From 2019 to 2022, PGE's wastewater had an average nitrate concentration of 38.9 mg/L—almost four times higher than the EPA's maximum contaminant level.

---

https://www.oregon.gov/deq/FilterRulemakingDocs/tables303140.pdf. (last visited Dec. 4, 2025).

   [4] Letter from Daniel Opalski to Wendy Wiles (Aug. 4, 2015) at 11, https://www.epa.gov/system/files/documents/2021-11/epa_approval_revised_oregon_wqs_08042015.pdf.

b.    **Columbia River Processing**

59.    Columbia River Processing (hereinafter "Tillamook") operates a cheese production facility at the Port of Morrow. Tillamook's facility generates an estimated 360 gallons of wastewater each year from a combination of cheese byproducts and tank wash water.[5]

60.    Tillamook's wastewater is very high in nitrates. From 2019 to 2022, Tillamook's wastewater had an average nitrate concentration of 24 mg/L—more than twice the EPA's maximum contaminant level.[6]

61.    In addition to producing its own wastewater at its production facility, Tillamook sources the milk used to make its cheese from Threemile Canyon Farms, a "megadairy" in Boardman that houses 70,000 head of cattle. Threemile land-applies high-nitrogen waste from its dairy operation to its farmland, often well in excess of the agronomic rate for nitrogen.

62.    Tillamook knows that Threemile land-applies animal waste in the LUBGWMA. In 2020, it described Threemile as a "best-in-class business partner[]" and noted that Threemile operates "a closed-loop farm" where cow manure "goes back into crops"—i.e., is land-applied.

63.    Threemile would not exist if not for Tillamook. Threemile began operation in 2001, "to supply milk to the Tillamook County Creamery Association's new Boardman cheese factory."[7] Threemile currently produces about 2.5 million pounds of milk every day, and all of it is bought by Tillamook. Threemile has increased the number of cattle it houses as Tillamook's Boardman

---

[5] Port of Morrow Operations, Monitoring, and Management Plan – Revision 2 at 2-8 (Sept. 2023).

[6] *Id.* at 2-13.

[7] Tracey Loew, *Manure is Big Business at Oregon's Largest Dairy with Conversion to Natural* Gas, STATESMAN JOURNAL (Jan, 29, 2025), https://eq-cap.com/manure-is-big-business-at-oregons-largest-dairy-with-conversion-to-natural-gas/.

operation has expanded. And as Threemile and Tillamook have gotten bigger, nitrate contamination in the LUBGWMA has gotten worse.

    **2.**    **Defendants partner with the Port of Morrow for disposal of their high-nitrate wastewater, even though they know the Port improperly disposes of this wastewater.**

    64.    The Port of Morrow operates a sprawling port and industrial park on the banks of the Columbia River in Morrow County. The Port is home to a variety of tenants and industries, including power plants, food processing facilities, shipping companies, and warehouse facilities.

    65.    The Port's operations include an industrial wastewater treatment and disposal system. The Port contracts with its industrial-park tenants, including PGE and Tillamook, to collect and dispose of millions of gallons of nitrate-heavy wastewater every year. Without first fully removing the nitrates from this wastewater, the Port "recycles" the wastewater by pumping it to local farms, where it is sprayed onto the land.

    66.    The Port owns three farms in the LUBGWMA where it dumps high-nitrate wastewater: Portview ("Farm 1"), Southport ("Farm 2"), and Eastport ("Farm 3"). The Port also contracts with Mader-Rust Farms and Madison Ranches to dump water on two additional LUBGWMA farms known as Farm 4 and Farm 5.

    67.    Until the winter of 2025, the Port pumped high-nitrate wastewater to these farms year-round, including during the winter, when most fields lie fallow and no crops benefit from the water.

    68.    Given concerns regarding nitrate pollution, the Port's wastewater disposal is governed by permits that cap the total amount of nitrogen- and nitrate-heavy wastewater that may be discharged onto nearby farmland. The Port's current DEQ permit is Water Pollution Control Facilities Permit No. 102325, as modified by a November 2022 amendment. The permit limits the volume of wastewater the Port can apply to fields on each farm according to those fields' capacity

to absorb nitrogen (which is largely a function of the crops planted on each field). It also requires the Port to monitor its facilities and discharges to prevent pollution.

69.     The Port of Morrow is a repeat and unrepentant violator of its discharge permit. It routinely takes in more wastewater from its tenants than it can safely dispose of on its designated fields, so it consistently dumps high-nitrate wastewater on fields in excess of the agronomic rate. The Port has violated its permit more than 2,000 times since 2015 by, among other things, dumping nitrogen in excess of the agronomic rate, failing to monitor crops at harvest for nitrogen removal, failing to report wastewater leaks, and dumping wastewater on prohibited non-growing season dates.

70.     The Port's repeated violations of its wastewater permit have been well-documented and well-known within the food processing and industrial communities in the LUBGWMA since at least mid-2022.

71.     On June 7, 2022, Morrow County declared a local state of emergency because private wells in the county were showing dangerous levels of nitrate contamination. The emergency declaration was covered by local news outlets. On June 10, 2022, an Oregon Public Broadcasting article noted that earlier in 2022, DEQ had "fined the Port of Morrow $1.3 million for overapplying 165 tons of nitrogen-rich wastewater onto agricultural fields over a four-year period and failing to monitor the nitrate contamination."[8]

72.     When Morrow County declared a public emergency, the Port released a public statement saying it was "considering millions of dollars in upgrades to reduce pollution and [was]

---

[8] Monica Samayoa, *Morrow County declares emergency over high nitrate levels in wells*, OREGON PUBLIC BROADCASTING (June 10, 2022), https://www.opb.org/article/2022/06/10/morrow-county-state-of-emergency-drinking-water-contamination-nitrate-levels/.

eager to play a role in finding workable solutions" to the nitrate contamination problem.[9] The Port was clearly aware that it was a major contributor to nitrate contamination in the LUBGWMA, and its major tenants—including PGE and Tillamook—must have known as well.

73.    The publicity about the Port's violations continued. On June 17, 2022, DEQ announced that it had identified an additional 626 permit violations in the winter months of November 2020 to February 2022 and added $800,000 to the Port's fine. News outlets reported that the total $2.1 million fine was the second largest in DEQ's history, and that the Port had violated its permit more than 2,000 times between 2018 and 2022.[10]

74.    The Port was undeterred; it publicly announced that it would continue dumping wastewater in the winter, and even DEQ admitted that it "expect[ed] the port will commit more violations."[11]

75.    As recently as October 2025, DEQ fined the Port for permit violations, including applying wastewater on fields during the non-growing season.[12]

76.    Despite the Port's well-documented violations of its wastewater permit, and the danger that its dumping poses to groundwater in the LUBGWMA, PGE and Tillamook have continued to send their high-nitrate wastewater to the Port so it can be dumped on nearby farms.

---

[9] *Id.*

[10] Monica Samayoa, *Port of Morrow continues to apply excess nitrates on farmland, misses payment deadline*, OREGON PUBLIC BROADCASTING (June 17, 2022), https://www.klcc.org/2022-06-17/oregon-increases-port-of-morrow-groundwater-pollution-fine-to-2-1-million.

[11] Monica Samayoa, *Oregon increases Port of Morrow groundwater pollution fine to $2.1 million*, OREGON PUBLIC BROADCASTING (Jan. 26, 2024), https://www.opb.org/article/2024/01/26/nitrate-pollution-port-of-morrow-groundwater-environment-drinking-oregon-boardman/.

[12] Alejandro Figueroa, *Oregon DEQ again fines Port of Morrow for wastewater violations*, OREGON PUBLIC BROADCASTING (Sept. 30, 2025), https://www.opb.org/article/2025/09/30/oregon-port-of-morrow-deq-department-environmental-quality-wastewater-nitrate-nitrates/.

77.     PGE sends an estimated 900 million gallons of high-nitrate wastewater to the Port each year. PGE alone is responsible for about 25 percent of the total volume of wastewater handled by the Port. The Port dumps PGE's wastewater on Farm 2 or stores it in the Pond #41 storage pond, from which water is dumped on Farms 1 and 3, or in the Sand Dune storage pond, from which it is dumped on Farms 4 and 5.

78.     Tillamook sends an estimated 360 million gallons of high-nitrate wastewater to the Port each year. Tillamook is responsible for about 10 percent of the total volume of wastewater handled by the Port. Tillamook conveys its high-nitrate wastewater to the Port of Morrow's North Lift Station, and it is subsequently pumped to the Pond #41 storage pond. Water from Pond #41 is dumped on Farms 1 and 3, or transported to the Sand Dune storage pond, from which it is dumped on Farms 4, and 5.

79.     Tillamook knows groundwater in the LUBGWMA is unsafe to drink. In January 2023, Tillamook Stewardship Coordinator Jamie Stewart attended a Morrow County Board of Commissioners Meeting at which "the nitrate emergency" was discussed.

80.     Also in 2023, Tillamook supported the formation of a nonprofit group called Water for Eastern Oregon, which bills itself as a coalition of businesses seeking "science-based" solutions to the nitrate contamination problem in the LUBGWMA.[13] The chairman of the group at the time was Michael Graham, the senior director of operations at Tillamook's Boardman facility.[14]

81.     In 2024, Graham published an opinion column in the *East Oregonian* acknowledging that "nitrate in groundwater" was a "challenge" in the Lower Umatilla Basin, and

---

[13] Taking Action, H2OEO, https://www.h2oeo.org/. (last visited Dec. 4, 2025).

[14] Antonio Sierra, *Oregon agriculture companies offer help with Lower Umatilla Basin nitrate pollution, but skeptics remain*, OREGON PUBLIC BROADCASTING (Jan. 24, 2024), https://www.opb.org/article/2024/01/24/water-pollution-nitrate-eastern-oregon-environment-well-groundwater-umatilla-morrow.

that "testing wells" and "providing immediate assistance for people affected by nitrates" was necessary.[15]

82.     Despite Tillamook's awareness that nitrate contamination is affecting residents of the LUBGWMA, it has continued to partner with both Threemile and the Port of Morrow. It provides a market for the milk produced by Threemile, and it sends hundreds of millions of gallons of its own high-nitrate wastewater to the Port of Morrow for land application each year. It thus sits at the center of a deeply destructive distribution chain.

**3.      Nitrates in discarded wastewater move downgradient from the farms where they are land-applied to Plaintiffs' wells.**

83.     The Port applies more high-nitrate and high-nitrogen water to its land application sites than the land can absorb. Unabsorbed nitrogen converts to nitrates in the soil. This soil, which is coarse-grained and sandy, allows the nitrates to percolate rapidly past the water table (the underground boundary between the soil surface and groundwater) and into groundwater. Nitrates reach the groundwater in a matter of days.

84.     Once nitrates reach the groundwater, they flow, along with the groundwater itself, in accordance with the underlying hydrogeology of the area. Groundwater moves from areas of higher elevation and water pressure to areas of lower elevation and pressure along a predictable route (that is, the water moves "downgradient").

85.     The wells Plaintiffs and other Class members rely on for their drinking water are all downgradient of the farms where the Port dumps high-nitrate wastewater.

---

[15] Michael Graham, *Other views: Progress on groundwater requires coordination, leadership*, EAST OREGONIAN (Jan. 27, 2024), https://eastoregonian.com/2024/01/27/other-views-progress-on-groundwater-requires-coordination-leadership.

86.     The map below illustrates the reach of nitrates as they move downgradient from the farms where they originate. The Port's land application sites are outlined in pink. The areas downgradient of each farm that are affected by excess nitrogen and nitrates dumped on those farms are outlined in dark red.[16]



---

[16] Plaintiff Mike Pearson has previously filed a related class action lawsuit against the Port of Morrow and other defendants. *See Pearson et al. v. Port of Morrow et al.*, No. 2:24-cv-00362 (D. Or.). The areas downgradient of defendants in the *Port of Morrow* case are different, and larger, than the areas downgradient of the land application sites at issue in this case.

87.     As illustrated in this map, the Boardman Area is downgradient of Farms 1 and 2. The Irrigon Area is downgradient of Farm 3. And the Hermiston Area is downgradient of Farms 4 and 5. Thus, all the excess nitrates from Tillamook and PGE that the Port dumps on these farms directly impact people who rent or own property that is supplied with water by private wells located in these affected Areas (the "Well-Reliant Class").

**4.     The wells Plaintiffs rely on for drinking water are contaminated with nitrates generated by PGE and Tillamook.**

88.     Groundwater in the Lower Umatilla Basin, on which Plaintiffs and other Class members rely for their water, has been plagued with high nitrate concentrations for decades. And the problem is getting worse.

89.     In the mid-1990s, groundwater samples from monitoring wells in the area showed high levels of nitrate contamination. Nearly 30% of groundwater samples showed nitrate levels that exceeded Oregon's GMA trigger threshold of 7 mg/L, and 23% of groundwater samples showed nitrate levels that exceed the EPA limit of 10 mg/L.

90.     Groundwater quality in the LUBGWMA has deteriorated since then, as industrial activity at the Port of Morrow has expanded. Since January 10, 2022, state and local officials have encouraged Morrow and Umatilla County residents who rely on private wells to have their wells tested for nitrates.

91.     As of October 31, 2025, 2,069 of the approximately 4,500 residential wells in the LUBGWMA have been tested. Approximately 24 percent of the wells tested in Umatilla County and 44 percent of the wells tested in Morrow County have nitrate levels above 10 mg/L. In total, at least 634 of the residential wells in the area have tested positive for nitrate concentrations above 10 mg/L, and 226 of those wells have nitrate concentrations of more than 25 mg/L—more than twice the EPA's maximum contaminant level. The Oregon Health Authority publishes these

figures and reminds residents that "***Nitrate levels above 10 mg/L are unsafe to drink or cook with.***"[17]

92.     Another 421 wells in the LUBGWMA have nitrate concentrations of 5–9.99 mg/L, meaning those wells are at risk of becoming unsafe to use for drinking or cooking if nitrate levels continue to rise.[18]

***Image 5. Results of nitrate testing in private wells as of October 31, 2025.***



---

[17] Oregon Health Authority, *Nitrate Testing, Treatment, and Water Delivery for the Lower Umatilla Basin*, "Public Health Domestic Well Testing, Nitrate Test Results At or Above 10 mg/L as of October 31, 2025." https://www.oregon.gov/oha/PH/HEALTHYENVIRONMENTS/DRINKINGWATER/SOURCE WATER/DOMESTICWELLSAFETY/pages/data.aspx. (last visited Dec. 4, 2025).

[18] *Id.*

93.     The State of Oregon has installed filtration systems at about 275 homes whose wells are above the EPA's 10 mg/L limit. At many of the remaining homes, nitrate levels are so high that filtration systems are not sufficient to bring nitrate concentrations within safe levels. The state is providing those homes with bottled water. In total, 318 households in Morrow County and 288 households in Umatilla County are receiving water delivery.[19]

94.     Plaintiffs Pearson and Fleming are among those LUBGWMA residents whose wells have been contaminated by nitrates from Defendants' operations.

95.     Mr. Fleming's home is downgradient of Farm 3. High-nitrate wastewater generated by Defendants has been dumped on Farm 3. Nitrates from that wastewater have percolated into groundwater and moved downgradient and into Mr. Fleming's well, which in 2024 had a nitrate concentration of 15 mg/L.

96.     Mr. Pearson's home is downgradient of Farm 1 and Farm 2. High-nitrate wastewater generated by Defendants has been dumped on Farms 1 and 2. Nitrates from that wastewater have percolated into groundwater and moved downgradient and into Mr. Pearson's well, which in 2022 had a nitrate concentration of 46.8 mg/L.

97.     In addition to private domestic wells, public water systems have also been affected.

98.     Plaintiff Cavasos (who relies on the City of Boardman's public water system) and Plaintiff Haley (who relies on the City of Irrigon's public water system) are among those LUBGWMA residents who rely on public water systems that have been affected by nitrates from Defendants' operations. Indeed, all persons who rent or own property that is supplied with water by public water systems that derive water from wells located in the Boardman Area, Irrigon Area,

---

[19] *Id.*

or Hermiston Area, as depicted in paragraph 86 (the "Public Water Class") have been affected by Defendants' disposal of high-nitrate wastewater.

99.     Of the 59 active public water systems in the LUBGWMA, 58 (all but the City of Hermiston) rely exclusively on groundwater. The Oregon DEQ has determined that the following public water systems in the LUBGWMA are at "substantial nitrate risk," defined as either having a nitrate-N measurement at or above 10 mg/L or by having the 90th percentile of the nitrate-N measurements greater than 5 mg/L:

*Table 1. LUBGWMA Public Water Systems at "Substantial Nitrate Risk"*

| Public Water System Name | Population | Location | County |
|---|---|---|---|
| Boardman, City of | 3,500 | Boardman, OR 97818 | Morrow |
| Country Garden Estates MHP | 175 | Irrigon, OR 97844 | Morrow |
| Irrigon, City of | 1,885 | Irrigon, OR 97844 | Morrow |
| River Point Farms LLC | 250 | Hermiston, OR 97838 | Umatilla |

*Source: Petition to the EPA submitted on behalf of Food & Water Watch et al., January 16, 2020*

100.     As of 2019, multiple public water systems downgradient of sites where Defendants' wastewater is land-applied, including systems in Boardman and Irrigon, had tested above the 10 mg/L maximum contamination limit ("MCL") or the 7 mg/L trigger level ("TL") for nitrate at least once.

*Table 2. LUBGWMA Nitrate Exceedances, 2002 to 2019*

| Public Water System Name | Population | Highest Recorded Nitrate Level | Contamination Frequency | County |
|---|---|---|---|---|
| Boardman, City of | 3,921 | 7.5 mg/L | 1 sample > TL | Morrow |
| Country Garden Estates MHP | 175 | 9.8 mg/L | 4 samples > TL | Morrow |
| Herreras Park | 20 | 8.9 mg/L | 6 samples > TL | Morrow |
| Irrigon, City of | 2,019 | 18 mg/L | 26 samples > MCL 42 samples > TL | Morrow |
| ODF/WL Irrigon Fish Hatchery | 18 | 40.9 mg/L | 21 samples > MCL 48 samples > TL | Morrow |
| River Point Farms LLC | 250 | 28.5 mg/L | 16 samples > MCL 23 samples > TL | Umatilla |

*Source: Petition to the EPA submitted on behalf of Food & Water Watch et al., January 16, 2020*

101. Each of these public water systems draws water from wells that are downgradient of sites where Defendants' wastewater is land-applied.

102. A well used by the City of Boardman is located off Marine Drive NE in Boardman, at Sailboard Beach. That well is downgradient of Farm 1 and Farm 2.

103. Country Garden Estates Mobile Home Park is located at 81435 Country Garden in Irrigon and is downgradient of Farm 3.

104. The City of Irrigon draws its water from at least two wells, one located on West 4th Street in Irrigon and one located between Steagal Lane and the Columbia River. Both wells are downgradient of Farm 3.

**E.    Nitrate pollution from PGE and Tillamook has harmed Plaintiffs and the Class.**

**1.    Plaintiffs and Class members who rely on private wells have been harmed.**

105. Defendants' actions, which have contaminated Plaintiff Pearson, Plaintiff Fleming, and Well-Reliant Class members' private wells with nitrates, have directly and proximately caused significant expenses and inconveniences. Plaintiffs and Well-Reliant Class members can no longer safely use the tap water in their homes because they are contaminated with nitrates. Instead, they must rely on bottled water deliveries for all their daily water needs.

106. The nitrate contamination has also diminished the value of residents' property, which is less valuable because they no longer have easy access to clean water.

107. In addition, Plaintiffs and Well-Reliant Class members have suffered physical harm as a result of ingesting water high in nitrates. As described above, exposure to excess nitrates causes significant health problems, including cancer and birth defects. Even Well-Reliant Class members who have not developed severe diseases, like cancer, have been harmed at a cellular level as a result of their exposure to nitrate in excess of 10 mg/L.

### 2. Plaintiffs and Class members who rely on water drawn from public wells have been harmed.

108.    Public water systems are required to test their water for nitrates frequently, and they remove nitrates from groundwater before it is distributed to consumers. As a result, water with excessive concentrations of nitrates only sometimes reaches consumers via public water systems. Thus, unlike well-reliant residents, Plaintiffs Cavasos and Haley and Public Water Class members who rely on public water systems are mostly assured that their water is safe to drink. However, this assurance comes at a price: public water systems that draw from the affected areas must spend money to remove nitrates from groundwater. These nitrate removal processes are expensive. Building a mid-sized nitrate treatment plant costs $10 to $15 million,[20] and running a nitrate removal plant costs several hundred dollars per day.[21]

109.    Public water systems recoup the costs of nitrate removal by passing those costs along to consumers, including Plaintiffs Cavasos and Haley and Public Water Class members. On average, people who live in areas with high levels of nitrate in the local water system pay more than $600 per year extra compared to people who live in areas with low nitrate concentrations, reflecting the cost of removing the nitrate from the water.[22] On information and belief, Plaintiffs Cavasos and Haley and Public Water Class members' water bills are several hundred dollars higher per year than they would be absent nitrate contamination caused by Defendants.

---

[20] Northeast-Midwest Institute, *NEMWI Releases New Study on the Cost of Nitrate Treatment* https://www.nemw.org/nemwi-releases-new-study-on-the-cost-of-nitrate-treatment-in-the-mississippi-river-basin/. (last visited Dec. 4, 2025).

[21] KCCI, FACEBOOK (July 2, 2025), https://www.facebook.com/kcci8/videos/its-expensive-to-run-central-iowa-water-works-nitrate-removal-facility-how-expen/10019333441476840/.

[22] Emily Moon, *The Cost of Cleaning Up Nitrate Contamination Falls on America's Poorest Counties,* PACIFIC STANDARD (Oct. 2, 2018), https://psmag.com/news/the-cost-of-cleaning-up-nitrate-contamination-falls-on-americas-poorest-counties.

**B.      Mitigating the harm Defendants have caused will require significant resources.**

110.    Fully remediating the LUBGWMA and removing nitrate from the groundwater itself is a difficult and expensive task that may take decades to achieve. Mitigating the harm Defendants have caused—and continue to cause—to Plaintiffs and Class members should therefore focus on ensuring Defendants stop contributing additional nitrate pollution to the LUBGWMA. Mitigation should also ensure that all households have access to clean tap water, that people who have ingested high levels of nitrate-contaminated water have access to a medical monitoring program, and that people who have paid more for access to public water systems than they would have absent Defendant's disposal of their wastewater are properly compensated.

**1.      Mitigating harm to well-reliant Plaintiffs and Class members.**

**a.      Ensuring access to clean tap water.**

111.    For a majority of well-reliant households within the geographic areas affected by Defendants' nitrate pollution, the most effective means of ensuring access to clean tap water is to connect these households to a public water system. Plaintiffs estimate that connecting to a nearby public water system will cost an average of $40,000 per household. In addition, paying for access to public water will cost each household about $1,000 per year—a cost Plaintiffs and other Well-Reliant Class members would not need to pay if they were able to continue relying on well water.

112.    For households that are too far from a public water system for a hookup to be practical, the best solution is to drill deeper wells to bypass the contaminated alluvial layer and reach the clean water in the underlying basalt layer. Drilling these deeper wells will cost an average of $40,000 per well.

**b.      Medical monitoring**

113.    A medical monitoring program should also be established for members of the Well-Reliant Class. A medical monitoring program that focuses on early detection and advances in

treatment of diseases related to chronic nitrate exposure would benefit not only Plaintiffs and Class members, but also the broader public: such a program would improve the medical community's understanding of the effects of chronic nitrate exposure and the best treatments for concomitant illnesses.

  **2.**  **Mitigating harm to Plaintiffs and Class members who rely on public water.**

114. As described above, Plaintiffs and Public Water Class members who rely on public water are often assured that their water is safe to drink. Mitigating the harm these individuals have suffered will instead require compensation for the hundreds of dollars per year they spend, and will continue to spend, to ensure continued access to clean drinking water.

## IV. CLASS ALLEGATIONS

115. Plaintiffs bring this action on behalf of themselves and, under Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, as a class action on behalf of the following Classes:

> **Well-Reliant Class**: All persons who rent or own property that is supplied with water by private wells that are located in the Boardman Area, Irrigon Area, or Hermiston Area, as depicted in Paragraph 86.

> **Public Water Class:** All persons who rent or own property that is supplied with water by public water systems that derive water from wells located in the Boardman Area, Irrigon Area, or Hermiston Area, as depicted in Paragraph 86.

116. Excluded from the Classes are Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, as well as the district judge(s) presiding over this matter and the clerks of said judge(s).

**A.      All requirements of Fed. R. Civ. P. 23(a) are met.**

117.     A class action is warranted in this case because the members of the Classes are so numerous that joinder of all members is impracticable; there are questions of law or fact common to the Classes; the claims of the representative parties are typical of the claims of the Classes; and the Plaintiffs named in this Complaint will fairly and adequately protect the interests of the Classes.

118.     **Numerosity**: Class members are so numerous (thousands total) that joinder of all Class members in a single proceeding would be impracticable. The disposition of the claims asserted through this class action will enhance efficiency and will benefit the parties and the Court.

119.     **Commonality**: Plaintiffs' claims are common to all members of the Classes, and individual complaints otherwise may result in inconsistent or varying adjudications.

120.     **Typicality**: The violations of law and resulting harms alleged by the named Plaintiffs are typical of the legal violations and harms suffered by all Class members.

121.     **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are adequate representatives of the Classes in that Plaintiffs have no interests adverse to, or that conflict with, the Classes which Plaintiffs seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex class actions of this nature.

**B.      All requirements of Fed. R. Civ. P. 23(b)(3) are met.**

122.     In addition to satisfying the prerequisites of Fed. R. Civ. P. 23(a), this case qualifies for class action treatment because questions of law or fact common to the Classes predominate over any questions affecting only individual Class members, and because a class action suit is superior to other available methods for adjudicating the controversy.

123.    **Predominance**: Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, but are not limited to:

a)   Whether nitrate contaminates the groundwater in the Boardman Area, Irrigon Area, and the Hermiston Area, as defined above;

b)   Whether Defendants' operations have caused nitrate to contaminate groundwater in the Boardman Area, Irrigon Area, and Hermiston Area;

c)   Whether the measures Defendants have implemented (if any) to prevent nitrate from contaminating the groundwater in the Boardman Area, Irrigon Area, and Hermiston Area are effective and sufficient;

d)   Whether Defendants have violated the Resource Conservation and Recovery Act;

e)   Whether Defendants breached a duty of reasonable care in their operations by allowing nitrates to contaminate the groundwater in the Boardman Area, Irrigon Area, and Hermiston Area;

f)   Whether Defendants trespassed on Plaintiffs' and other Class members' property;

g)   Whether Defendants created a nuisance by unreasonably interfering with Plaintiffs' and Class members' use and enjoyment of their properties;

h)   Whether Plaintiffs and the Class members are entitled to equitable relief, including, but not limited to, injunctive relief and medical monitoring; and

i)   Whether Plaintiffs and other Class members are entitled to damages and other monetary relief and, if so, in what amount.

124.    **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered

in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and Class members, while substantial, are small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct. And, even if Class members could afford individual litigation, the court system could not. Individualized litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

125.    In the alternative, Plaintiffs seek class certification as to particular issues permitted under Fed. R. Civ. P. 23(c)(4). Plaintiffs seek certification as to common questions related to the impact of nitrates released by Defendants, and Defendants' responsibility for those releases.

**COUNT I**
**RESOURCE CONSERVATION AND RECOVERY ACT,**
**42 U.S.C. § 6972(A)(1)(B)**
(On behalf of the Well-Reliant and Public Water Classes)

126.    Plaintiffs reallege and incorporate by reference the above paragraphs.

127.    42 U.S.C. § 6972(a)(l)(B), under which Plaintiffs bring this claim, is RCRA's citizen enforcement provision. Section 6972(a)(l)(B) authorizes "any person" to seek redress in federal court for risks posed to public health and the environment by "hazardous wastes" and "solid wastes," so long as the defendant falls within one of the categories of entities that Congress declared liable under § 7002(a)(l)(B). Included in § 7002(a)(l)(B) are entities that generated; transported; owned or operated a treatment, storage, or disposal facility; or contributed to "past or present handling, storage, treatment, transportation, or disposal" of the "solid wastes" at issue.

128.    Defendants' industrial wastewater is a is "solid waste" within the meaning of 42 U.S.C. § 6903(27) because the water is discarded material resulting from Defendants' industrial operations. Defendants' industrial wastewater is also hazardous waste within the meaning of 42 U.S.C. §6093(5) because the water contains high levels of nitrates, which pose a substantial hazard to the health of residents of the LUBGWMA.

129.    Defendants have both generated, transported, stored, and disposed of nitrate-heavy industrial wastewater, a solid waste and hazard as those terms are defined under RCRA, 42 U.S.C. § 6901, et seq., as well as under Oregon state solid and hazardous waste laws and regulations.

130.    The presence of hazardous substances and wastes causing nitrate concentrations above the levels and standards allowed by the Oregon DEQ constitutes an imminent and substantial endangerment to human health and the environment and threatens ground water quality in the LUBGWMA.

131.    Pursuant to 42 U.S.C. § 6972(b)(2)(A), Plaintiffs notified Defendants, the Administrator of the United States Environmental Protection Agency (the "Administrator"), and the State of Oregon of the endangerment more than 90 days in advance of filing this action. Plaintiffs also provided a copy of this Complaint to the Administrator. To Plaintiffs' knowledge, neither the Administrator nor the state of Oregon has commenced any of the actions set forth under 42 U.S.C. § 6972(b)(2)(B), (b)(2)(C).

132.    Under 42 U.S.C. § 6972(a)(1)(B), Defendants are individually and jointly liable pursuant to 42 U.S.C. § 6972, et seq., for conducting such action as is necessary to abate the endangerment to human health and the environment because they are past and present generators, transporters, and owners or operators of facilities that contribute to the handling, storage, and/or

transportation of solid or hazardous waste that now presents an imminent and substantial endangerment to health or the environment.

133.    Under 42 U.S.C. § 6972(e), Plaintiffs are entitled to recover costs incurred in bringing this action, including reasonable attorney fees and expert witness fees.

### COUNT II
### NEGLIGENCE
(On behalf of the Well-Reliant and Public Water Classes)

134.    Plaintiffs reallege and incorporate by reference the above paragraphs.

135.    Defendants have breached their duty to exercise ordinary care, and that breach caused Plaintiffs' and other Class members' injuries.

136.    A reasonably careful power generation facility or food processing facility would not allow high-nitrate wastewater from its facility to be sprayed onto nearby fields in quantities that cause nitrate contamination of a local aquifer upon which people rely for drinking water. Nor would a reasonably careful power generation facility or food processing facility partner with an entity such as the Port of Morrow for wastewater disposal services, given the Port's rampant violations of a wastewater disposal permit intended to protect public health.

137.    Defendants knew their operations were causing and continue to cause nitrate contamination in LUBGWMA groundwater, upon which Plaintiffs and the Class rely for clean drinking water.

138.    Defendants know nitrates are hazardous to human health.

139.    Despite this knowledge, Defendants continued to convey their wastewater to the Port of Morrow, a known polluter, causing nitrate contamination of groundwater in the Boardman Area, Irrigon Area, and Hermiston Area, as defined above.

140.    Defendants' decision to engage in activities that they knew or should have known would harm people living in the Boardman Area, Irrigon Area, and Hermiston Area constitutes a breach of Defendants' ordinary duty of care.

141.    Defendants' breach of their duty of care is a substantial factor in causing Plaintiffs' injuries. PGE and Tillamook each send the Port of Morrow hundreds of millions of gallons of high-nitrate wastewater every year. The more wastewater Defendants send to the Port, the more wastewater the Port dumps in the LUBGWMA. If not for Defendants' decision to send hundreds of millions of gallons of high-nitrate wastewater to the Port of Morrow every year, the Port would not have land-applied those hundreds of millions of gallons of wastewater on Farms 1–5, and nitrate levels downgradient of those sites would not be as high as they are.

142.    As a result of Defendants' breach of their duties, Plaintiffs and the Classes have suffered injuries and will continue to suffer injuries. For members of the Public Water Class, those injuries include increased water prices. For members of the Well-Reliant Class, those injuries include a reduction in property values, the inconvenience associated with being unable to use tap water for drinking and cooking, cellular damage caused by exposure to nitrates, and an increased risk of developing life-threatening illnesses, including cancer.

### COUNT III
### TRESPASS
(On behalf of the Well-Reliant Class)

143.    Plaintiffs reallege and incorporate by reference the above paragraphs.

144.    Defendants have caused, and continue to cause, pollutants to enter onto real property owned by Plaintiffs and Class members. This trespass was intentional because Defendants knew that the entry of pollutants onto Plaintiffs' and Class members' property was certain, or

substantially certain, to result from their operations. Despite this substantial certainty, Defendants still went ahead with their operations.

146.    Such intrusions re-occur many times each day as additional nitrate particles enter onto Plaintiffs' and Class members' property.

146.    Publicity surrounding Morrow County's emergency declaration and the Port of Morrow's repeated violations of its wastewater discharge permit, as well as Defendants' own awareness of the nitrate contamination issues in the LUBGWMA, put Defendants on notice that their operations were causing nitrates to pollute Plaintiffs' and Class members' properties. It was therefore reasonably foreseeable that their operations would disturb Plaintiffs' and Class members' possessory interests.

147.    Defendants' trespass is without right or license and violates the exclusive property rights of Plaintiffs and Class members. The pollutants that Defendants caused to spread through groundwater in the Boardman, Irrigon, and Hermiston Areas and to contaminate Plaintiffs' and Class members' water constitute an unreasonable interference with possessory use of their respective properties.

148.    Defendants' intentional trespass has resulted in actual and substantial damages to the real property owned by Plaintiffs and members of the Well-Reliant Class because their properties are now contaminated with nitrates in concentrations that are hazardous to human health.

**COUNT V**
**PRIVATE NUISANCE**
(On behalf of the Well-Reliant Class)

149.    Plaintiffs reallege and incorporate by reference the above paragraphs.

150.    Defendants' disposal of wastewater has substantially and unreasonably interfered with Plaintiffs' and the Class's use and enjoyment of their land.

151.    Defendants knew or had reason to know that their actions were causing nitrate contamination in the Boardman Area, Irrigon Area, and Hermiston Area, thereby interfering with Plaintiffs' and the Class's use and enjoyment of their properties.

152.    Defendants' actions have in fact interfered with Plaintiffs' and the Class's use and enjoyment of their properties. Because groundwater in the Boardman Area, Irrigon Area, and Hermiston Area is contaminated with nitrates, Plaintiffs are unable to rely on their wells to provide safe drinking water.

153.    The utility of excess wastewater dumping and the burden of reducing the amount of nitrogen and nitrates in Defendants' soil and water is slight compared with the risk that Defendants' conduct would contaminate Plaintiffs' and the Class's wells and substantially interfere with their use and enjoyment of their property.

154.    Defendants failed to exercise due care to eliminate the risk of nitrates contaminating groundwater in the Boardman Area, Irrigon Area, and Hermiston Area.

155.    Defendants' disposal of wastewater caused Plaintiffs and the Class personal and property damage in an amount to be proven at trial. Defendants' conduct has rendered private wells unfit for use, forcing Plaintiffs and Class members who rely on private wells to either continually expose themselves to an unacceptably high risk of severe illness or rely on expensive and/or cumbersome alternative drinking water sources. Well-Reliant Class members have also suffered cellular damage caused by exposure to nitrates and are at an increased risk of developing life-threatening illnesses, including cancer.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for judgment against Defendants as follows:

A.      For a declaratory judgment that Defendants have violated and continue to be in violation of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B);

B.      For an order of the Court compelling Defendants to provide clean, potable water to all members of the Well-Reliant Class by connecting members of this Class to public water systems or by drilling wells deep enough to provide clean, potable water;

C.      For an order of the Court compelling Defendants to pay the water bills of members of the Well-Reliant Class who are connected to public water systems;

D.      For an order of the Court compelling Defendants to conduct and pay for medical monitoring for Well-Reliant Class members;

E.      For all general and compensatory damages proved and awarded by the jury or this Court;

F.      For punitive damages to punish and deter those Defendants subject to Or. Rev. Stat. § 31.730;

G.      For all other damages allowed by law and awarded by the jury;

H.      For Plaintiffs' litigation costs, including attorney and expert witness fees and other costs, under 42 U.S.C. § 6972(e) or as otherwise allowable by law; and

I.      For such other and further relief as the Court deems just and equitable under the circumstances.

## JURY DEMAND

Plaintiffs hereby demand a jury trial on all claims triable by right.

DATED:  December 5, 2025

Respectfully submitted,

By: */s/ Michael A. Bliven*
    Michael A. Bliven, Oregon State Bar No. 942510
BLIVEN LAW FIRM, PC
704 S. Main
Kalispell, MT 59901
Telephone: (406) 755-6828
Facsimile: (406) 755-6829
mike@blivenlawfirm.com

Robert F. Dwyer, III, Oregon State Bar No. 984197
BLIVEN LAW FIRM, PC
202 North Main Street, Suite 1
Boardman OR 97818
Telephone: (406) 755-6828
Facsimile: (406) 755-6829
rdwyer@blivenlawfirm.com

Steve W. Berman (*pro hac vice application
forthcoming*)
Meredith S. Simons (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98134
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
merediths@hbsslaw.com

Abigail D. Pershing (*pro hac vice application
forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
abigailp@hbsslaw.com

John Heenan (*pro hac vice application forthcoming*)
HEENAN & COOK
1631 Zimmerman Trail
Billings, MT 59102
Telephone: (406) 839-9091
Facsimile: (406) 839-9092
john@lawmontana.com

*Attorneys for Plaintiffs and the Proposed Classes*